[Docket Nos. 28, 29]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

JOHN VALENTINE and
VALENTINE'S FARM, LLC,

        Plaintiffs,

        v.

MONROE TOWNSHIP, a Municipal
Corporation for the State of New
Jersey; SALVATORE "SKIP"
TORMARCHIO; TARA PARK n/k/a
TARA NELMS; RICHARD
DILUCIA, Mayor of Monroe
Township; RALPH MANFREDI;
STEVEN D'AMICO; ROSEMARY
FLAHERTY, Fictitious defendants
John Does 1-5 and Jane Does 1-5,

        Defendants.

Civil No. 22-4384 (RMB/MJS)

*Consolidated with Civil No. 22-5562*

**OPINION**

**APPEARANCES**
Andrew Joseph Karcich
The Law Offices of Andrew J. Karcich, LLC
1000 White Horse Road, Suite 703
Voorhees, New Jersey 08043

    *On behalf of Plaintiffs*

Michael Vincent Madden
Madden & Madden, PA
108 Kings Highway East, Suite 200
P.O. Box 210
Haddonfield, New Jersey 08033-0389

    *On behalf of Defendants Monroe Township, a Municipal Corporation for the State of*
    *New Jersey; Tara Park n/k/a Tara Nelms; Richard Dilucia, Mayor of Monroe*
    *Township; Steven D'Amico*

Erin R. Thompson
Birchmeier & Powell, Esqs.
1891 State Highway 50
P.O. Box 582
Tuckahoe, New Jersey 08250-0582

> On behalf of Defendants Salvatore "Skip" Tormarchio; Ralph Manfredi;
> Rosemary Flaherty

**BUMB, Chief District Judge**

This matter comes before the Court upon two motions for dismissal:  the Motion to Dismiss by Defendants Salvatore "Skip" Tormarchio (the "Fire Marshal"), Ralph Manfredi, and Rosemary Flaherty (collectively referred to as the "Individual Defendants") filed on February 7, 2023 [Docket No. 28 (the "Ind. Br.")]; and the Motion to Dismiss by Defendants Monroe Township, Tara Park n/k/a Tara Nelms ("Ms. Park"), Richard Dilucia ("Mayor Dilucia"), and Steven D'Amico (collectively referred to as the "Monroe Defendants" and with the Individual Defendants as "Defendants") filed on February 8, 2023 [Docket No. 29, 29-3 (the "Monroe Br.")]. Plaintiffs John Valentine and Valentine's Farm, LLC[1] (collectively referred to as "Plaintiffs") have filed Briefs in Opposition to both pending motions. [Docket Nos. 32 (the "Monroe Opp'n"), 33 (the "Ind. Opp'n").] On March 13, 2023, the Monroe Defendants submitted a Reply Brief. [Docket No. 34 (the "Monroe Reply").] Having been fully briefed, the motions are now ripe for adjudication.

---

[1] Mr. Valentine is the principal owner, member, and manager of Valentine's Farm, LLC, which is a New Jersey LLC. [Compl. at 1 ¶¶ 3–4.]

2

## I.   FACTUAL BACKGROUND

This action arises out of a multitude of land use issues and permit requests made by Plaintiffs, which Plaintiffs allege were ultimately denied by the Township as part of a conspiracy among local officials who harbored personal animus against Plaintiffs and also allegedly issued erroneous code violations to Plaintiffs regarding their property at 3524 South Black Horse Pike, in the Township of Monroe, in the State of New Jersey (the "Farm"). The parties maintain different interpretations of the facts, and importantly, each other's motives. For purposes of this Opinion, the Court assumes the facts alleged by Plaintiffs to be true and views the allegations in a light most favorable to them.

### A.   Plaintiffs' Allegations of a Conspiracy Among Local Officials

In 2016, Plaintiff John Valentine purchased the Farm for the purposes of operating Plaintiff Valentine's Farm, LLC, a "farm and farm related business." [Docket No. 14 (the "Consolidated Complaint" or "Compl."), at 4 ¶ 1.] Plaintiffs' neighbor residing at 3546 South Black Horse Pike (referred to herein as the "Fire Marshal's son") is the son of Defendant Skip Tormarchio, the Fire Marshal for Monroe Township.[2] [*Id.* ¶¶ 2, 5, 13.] Plaintiffs state that the Fire Marshal "is and claims to be 'politically connected' in Monroe Township," having served as the Monroe Township Fire Marshal for over 25 years. [*Id.* ¶ 4.] Plaintiffs allege that the

---

[2] Per the Consolidated Complaint, the Fire Marshal has been employed by the Monroe Township Department of Public Safety since at least 2016. [Compl. at 4 ¶ 2.]

Fire Marshal has known and worked with Defendant Ralph Manfredi, the Code Enforcement Officer of Monroe Township, for over 20 years. [*Id.* ¶ 82.]

Beginning in 2018, Mr. Valentine and his neighbors, but primarily the Fire Marshal's son, "engaged in a series of disputes regarding various use issues and development of their respective properties," which persisted up until at least the filing of the Consolidated Complaint. [*Id.* ¶¶ 6–7.] Plaintiffs claim that, in response, the Fire Marshal leveraged his political standing to negatively impact how the Plaintiffs were treated by the Township. [*See Id.* ¶¶ 34, 46, 58, 97, 150] Further, Plaintiffs allege that the Township and its officials refused to enforce the Township Codes against their neighbors while unreasonably enforcing it against them. [*Id.* ¶ 154.] The Defendants' acts, discussed below, are in reference to such alleged conspiracy by Defendants to impede Plaintiffs' usage and enjoyment of the Farm.

The Consolidated Complaint states that "[b]eginning in June 2018, Mr. Valentine noticed a negative change in the way he was being treated by Township officials . . . when conducting official business for permits, licenses and other Township approvals for the use and development of the Property." [*Id.* ¶ 9.] In December 2018, the Fire Marshal's son "began taunting" Mr. Valentine by saying, "[my] father owns this town and you're never going to get anything done." [*Id.* ¶ 13.] This confrontation occurred around the time when Defendants Tara Park and Rosemary Flaherty, Township zoning officers, allegedly refused to deliver Mr. Valentine his written livestock permit and charged him with a violation for not

having shelter for his animals; an offense Plaintiffs purport is not even regulated by the Township Code. [*Id.* ¶¶ 11–12.]

Since that time, Plaintiffs argue that many of their dealings unfolded in a similar fashion because of the alleged conspiracy among local officials. More specifically, Mr. Valentine claims that he was either threatened with, or issued violations for, additional conduct that was not regulated by the Township Code, including failing to both fence and house his livestock [*Id.* ¶ 30], failing to remove cut trees, [*Id.* ¶¶ 30, 53, 113–115], and using improper fencing materials and colors [*Id.* ¶¶ 39–40, 54–55, 57]. Furthermore, Mr. Valentine states he had his permits erroneously revoked or denied, such as the permits for agricultural uses [*Id.* ¶¶ 45–46, 122–123, 128–129] and light poles [*Id.* ¶¶ 109–111, 113, 115].

Additionally, Mr. Valentine contends that when he reported code violations to the Township, they were either ignored or met with animus. More specifically, when Mr. Valentine reported Fire Marshal's son for doing construction "beginning in 2018" without a permit, no action was taken by any Township official. [*Id.* ¶¶ 24–25.] As a result, Plaintiffs claim the construction flooded the Farm and created a pond, which Plaintiffs were subsequently issued a violation for. [*Id.* ¶¶ 59–61.] On another occasion, Mr. Valentine reported another neighbor for storing potentially hazardous vehicles, which the Township allegedly never acted to rectify. [*Id.* ¶¶ 133–136.] Instead, within six hours of the report, Mr. D'Amico, the Township's Plumbing Sub-Code official, issued Plaintiffs two code violations that were unrelated to plumbing. [*Id.* ¶¶ 137, 139.]

5

However, the most significant dispute regards the permit for a safety berm on the Farm, a requirement imposed on Mr. Valentine because he uses his land for firearms target practice. [*Id.* ¶¶ 16–20.] On the morning of July 22, 2019, Defendant Manfredi purportedly led an unannounced "raid" on the Farm, along with Defendants Ms. Park and Mr. D'Amico, as well as at least two armed police officers. [*Id.* ¶¶ 62–64, 68.] The Farm was occupied by Mr. Valentine's girlfriend, nine-year-old son, and fourteen-year-old daughter, who Mr. Valentine asserts were terrified by the raid. [*Id.* ¶¶ 76–77.] Without Mr. Valentine's permission, the officials entered the Farm and took photos, videos, and a voice recording, with the alleged purpose of determining if the safety berm was constructed. [*Id.* ¶¶ 70, 73, 80, 81.] At the time, Mr. Manfredi directly reported to Defendant Richard DiLucia, the Mayor of Monroe Township, who Plaintiffs claim authorized the raid. [*Id.* ¶¶ 78–79.]

Three months prior to the raid, Mr. Valentine filed disorderly persons charges against the Fire Marshal's son in the Monroe Municipal Court, which Fire Marshal's son was subsequently arrested and charged for. [*Id.* ¶¶ 85–86.] Mr. Valentine was a witness in this pending criminal matter at the time of the raid. [*Id.* ¶¶ 95–96.] While Mr. Valentine was in the courthouse regarding the criminal matter, he alleges that the Fire Marshal approached him and said, "he would wipe the smile off Mr. Valentine's face while holding his Fire Marshal badge in Mr. Valentine's face." [*Id.* ¶ 116.] Prior to that confrontation, Mr. Valentine audio recorded the Fire Marshal's son who also verbally threatened him and avowed his father's political connections. [*Id.* ¶¶ 118.]

After the raid, Plaintiffs did not receive any citations or violations, despite never constructing the safety berm. [*Id*. ¶¶ 67, 100.] Furthermore, Mr. Manfredi did not include the voice recording of the raid in his report to the Township, and allegedly did not tell Mayor DiLucia about the recording of the raid either. [*Id*. ¶¶ 101–102.] Instead, Plaintiffs contend that Mr. Manfredi gave a copy to the Fire Marshal's son and daughter-in-law, who Plaintiffs' claim were already contemplating civil litigation against them at such time. [*Id*. ¶¶ 103–104.] Plaintiffs also claim the Fire Marshal directed Mr. Manfredi to provide the recording to his daughter-in-law to conceal his role in the raid. [*Id*. ¶ 105.] However, when questioned under oath, Mr. Manfredi said the Fire Marshal never directly asked him to write violations against Plaintiffs, a fact Plaintiffs dispute. [*Id*. ¶¶ 98–99.]

Plaintiffs experienced further confrontation with the Fire Marshal and disparate treatment from the Township. On March 10, 2021, while in his official vehicle, Fire Marshal chased an individual unrelated to Plaintiffs' property and into their driveway. [*Id*. ¶¶ 141–142.] The Fire Marshal allegedly trespassed and engaged in a violent altercation with the individual in front of Mr. Valentine's young son. [*Id*. ¶ 144.] The individual stopped by the Fire Marshal on Plaintiffs' property was allegedly in litigation against the Fire Marshal's son. [*Id*. ¶ 140.] Furthermore, starting in late 2021, a police officer for Monroe Township began issuing Mr. Valentine's girlfriend numerous traffic citations. [*Id*. ¶ 145.] The officer was a volunteer fireman in Monroe Township, and he allegedly admitted he issued the citations in an attempt to get a position as a paid fireman. [*Id*. ¶ 147, 149, 151.]

7

Plaintiffs also allege that Monroe Township has not taken any steps to correct or punish the Fire Marshal for any improper conduct. [*Id.* ¶ 152.]

**B.      Plaintiffs' Allegations Concerning Land Use Issues**

In addition to the alleged conspiracy described above, the Consolidated Complaint describes several issues pertaining to Plaintiffs' land use on the farm, including Plaintiffs' ability to obtain land use permits from the Township as well as Plaintiffs' interests in not being unfairly assessed for land use violations. The first land use issue concerns Mr. Valentine's request for a livestock permit submitted on or around June 4, 2018, to Ms. Flaherty. [*Id.* ¶ 10.] Ms. Flaherty allegedly gave Plaintiff verbal approval, however she "refused" to deliver the written permit. [*Id.* ¶ 11.] Then, on December 12, 2018, Ms. Park purportedly issued erroneous violation notices for Plaintiffs' failure to both fence and house livestock. [*Id.* ¶ 30.] Plaintiffs claim the violation was erroneous since the Township Code distinguishes between livestock and poultry, and they only possessed poultry at the time. [*Id.* ¶¶ 31, 33.] Furthermore, Plaintiffs argue they could not have constructed a fence regardless, as the Fire Marshal's son "erected a fence and installed plantings on [Plaintiffs'] property which [the Fire Marshal's son] would not timely remove." [*Id.* ¶ 35.]

In April 2019, Mr. Valentine was issued a permit for a "chain link" fence, but after construction was finished, he received a violation for using other fencing materials, which he claims is not even regulated by the Township Code. [*Id.* ¶¶ 38–40.] On April 30, 2019, he requested a second permit for a wire fence. [*Id.* ¶ 41.] The

Township officials allegedly responded to Mr. Valentine by: (1) requesting he submit pictures of the materials to be used, (2) refusing the request due to an alleged open permit violation, and (3) claiming that he was "not permitted to have an agricultural 'use' within 50 feet of his property line." [*Id.* ¶¶ 42–43, 45.] Plaintiffs assert the refusal was erroneous, as the alleged permit violation had already been remedied, and "agricultural uses," as opposed to "agricultural structures," are permitted anywhere on the property. [*Id.* ¶¶ 44, 46.]

In May 2019, after constructing the fence, Mr. Valentine painted it red, white, and blue. [*Id.* ¶¶ 54.] In response, Ms. Park sent an unsigned letter to Plaintiffs and their neighbors "suggesting" that Plaintiffs should paint their fence white or brown, although Plaintiff maintains that the Township Code does not regulate fence color. [*Id.* ¶¶ 54–55, 57.]

As discussed above, another issue concerns the construction of the "safety berm" on the Farm. As a lawful gun owner, and in accordance with the Monroe ordinance,[3] Mr. Valentine would conduct firearms target practice on the Farm, which induced numerous police complaints from his neighbors. [*Id.* ¶¶ 14–16.] In response, Monroe officials "encouraged [Plaintiffs] to construct a 'Berm' to fire into during target practice," despite the lack of any Township Code requiring such. [*Id.* ¶¶ 17, 19.] Nevertheless, Ms. Flaherty "required the permit for and ordered Mr. Valentine to construct the safety Berm," and on July 3, 2018, she issued the permit.

---

[3] Mr. Valentine asserts he did not discharge any firearm within 450 feet of a residence as mandated by applicable Monroe ordinance. [Compl. ¶¶ 15–16.]

[*Id.* ¶¶ 18, 22.] As discussed, Monroe officials conducted a raid on the Farm with the alleged purpose of determining if the safety berm was constructed on July 22, 2019, and accordingly, they confirmed that it was not. [*Id.* ¶¶ 62, 66–67.]

Plaintiffs contend the Fire Marshal's son further interfered with their property by causing flooding on their farm, which killed their trees and formed a pond. [*Id.* ¶¶ 26–27.] According to Plaintiffs, the Fire Marshal's son "commenced various building and construction activities . . . includ[ing] clearing, grading, filling, and construction of a road behind their residence without having obtained all appropriate approvals and permits, and in violation of the Township Code." [*Id.* ¶¶ 23–24.] Plaintiffs assert this unapproved construction caused flooding on their farm, which led their trees to become diseased and hazardous, and ultimately forced Mr. Valentine to chop some of them down. [*Id.* ¶¶ 26–28.] Plaintiffs claim that "neither [Ms. Flaherty] nor any other Township officials" took action when they reported the construction projects. [*Id.* ¶ 25.] Contrarily, Ms. Flaherty issued Mr. Valentine a violation for failing to remove the cut trees. [*Id.* ¶30.] Still, none of Plaintiffs' neighbors are named as a party to this suit.

In May 2019, Plaintiffs hired an arborist who confirmed that the trees in the flooded portion of the Farm were either dead or dying from disease and were a safety and property risk that would need to be removed. [*Id.* ¶¶ 47–48.] Mr. Valentine consulted Ms. Park about removing them, and she advised him that he needed to get approval from the New Jersey Pinelands Commission. [*Id.* ¶ 49.] Although the Pinelands Commission instructed Mr. Valentine that he did not need its approval,

10

Ms. Park continued to insist otherwise, and further instructed him to submit a plan for the tree removal, despite no such requirement in the Township Code. [*Id.* ¶¶ 51–53, ¶ 114.] Mr. Valentine asserts that he submitted a tree removal plan, but nevertheless was repeatedly threatened with legal action for failing to submit a plan in subsequent letters from the zoning officer. [*Id.* ¶¶ 112, 113, 115.] Beyond damaging Plaintiffs' trees, the flooding also created a pond on the Farm. [*Id.* ¶ 60.] In July 2019, Ms. Park "accused Mr. Valentine of clearing his [p]roperty and creating a pond in violation of the Township Code," although Plaintiffs argue the pond would have never formed if the Township intervened when the Fire Marshal's son's construction was initially reported. [*Id.* ¶¶ 59, 61.]

Mr. Valentine also claims that he was harassed by the Township regarding the installation of three light poles on the Farm, which he had already received a permit for. [*Id.* ¶¶ 106, 109–110.] On August 14, 2019, Mr. Valentine received a letter from the zoning officer revoking the permit and directing him to seek a variance. [*Id.* ¶ 111.] In two subsequent letters, Ms. Park "threatened legal action against Mr. Valentine for not obtaining a variance for the light poles installed with the permit issued by the Township . . . ." [*Id.* ¶¶ 113, 115.]

Starting in July 2020, Plaintiffs claim that there were various additional issues, violations, and threats. First, on July 21, 2020, Ms. Park sent Mr. Valentine a letter threatening a violation for the location of his chicken coop claiming that the property

was not a farm,[4] despite the fact that:  (1) the Township zoning map shows the property is in an agricultural use district, (2) Mr. Valentine operated the property as a farm since June 2018, and (3) Ms. Park had previously issued him a poultry license, which is an agricultural use. [*Id.* ¶¶ 119, 122–123.] Second, on August 13, 2020, Ms. Park sent Mr.  Valentine a letter that withdrew some violations, but still insisted there was a fence violation.[5] [*Id.* ¶ 124.] Nevertheless, one-week later Ms. Park reinstated some of the previously withdrawn violations. [*Id.* ¶ 125.] Third, on October 16, 2020, Mr. Valentine applied for a farm accessory structures permit, which was subsequently denied and accompanied with a citation "for the construction of a feed shed structure of improvement which was never built." [*Id.* ¶¶ 128–129.] Over a year later, on March 24, 2022, Ms. Park "finally relented and reluctantly issued the Zoning Permit for farm accessory structures." [*Id.* ¶ 130.]

Plaintiffs also claim they have experienced disparate treatment from the Township as compared to their neighbors. [*Id.* ¶ 132.] Around September 2021, Mr. Valentine became concerned that one of his neighbors[6] was storing hundreds of damaged vehicles that were leaking harmful pollutants into the soil and groundwater. [*Id.* ¶¶ 133–134.] Mr. Valentine alleges he reported the issue to Ms.

---

[4] Plaintiffs claim that Ms. Park initially argued that the Farm violated the "International Property Maintenance Code", although the IPMC was never adopted into the Township Code. [Compl. ¶¶ 119, 121.]

[5] On September 3, 2020, Mr. Valentine "applied for an 'additional' fence permit" which was granted. [Compl. ¶¶ 126–127.]

[6] This neighbor's property is located at 1398 South Black Horse Pike, Williamstown, New Jersey. [Compl. ¶ 133.]

Park, but "Township officials had either condoned or turned a blind eye to the improper creation of a junk yard in the Township and did not want action taken." [*Id.* ¶ 135–136.] Furthermore, within six hours of reporting the issue, Mr. Valentine received two code violations from Steven D'Amico, the Township's Plumbing Sub-code official, who Mr. Valentine assert "had no authority to issue the violations which had nothing to do with plumbing." [*Id.* ¶¶ 137, 139.]

## II.     PROCEDURAL BACKGROUND

In July 2022, Plaintiffs initiated separate actions against Defendants in this Court and the New Jersey Superior Court, Gloucester County, Law Division; subsequently, the state court action was removed, and the two actions were consolidated pursuant to an Order by this Court dated November 28, 2022. [Docket No. 13.] On December 6, 2022, Plaintiffs filed the Consolidated Complaint. [Docket No. 14.]

As an initial matter, the Consolidated Complaint is unclear in terms of which specific causes of action Plaintiffs have brought against Defendants. Counts I and III both allege Violations of Equal Protection against all Defendants under 42 U.S.C. §1983; Counts II and IV also allege violations of 42 U.S.C. §§ 1983, 1988, asserting Violations of Substantive Due Process since the course of conduct taken by Defendants was pursuant to a Township policy (Count II), as well as Violations of Procedural and Substantive Due Process, asserting a theory of vicarious liability for acts taken by Defendants within the scope of their employment with the Township (Count IV); Count V arises under the Equal Protection Clause of the U.S.

13

Constitution, but contains a caption that Plaintiffs were denied equal protection under the laws of the State of New Jersey; Count VI asserts Violations of Due Process under the New Jersey Civil Rights Act ("NJCRA"); Count VII asserts Violations of the New Jersey Civil RICO Act under N.J.S.A. 2C: 41-2(c); Count VIII asserts Official Misconduct by New Jersey Township Employees under N.J.S.A. 2C: 30-2, N.J.S.A. 2C: 30-6 and N.J.S.A. 2C: 30-7; finally, the Consolidated Complaint asserts Claim IX against John/Jane Does 1-5. [Compl. ¶¶ 348–452.]

On January 18, 2023, this Court Ordered that Count VII of the Consolidated Complaint (violations of New Jersey Civil RICO Act) as asserted against Monroe Township and Count VIII of the Consolidated Complaint (official misconduct by New Jersey Township employees) **dismissed with prejudice** [Docket No. 27], following Plaintiffs' pre-motion letter conceding that those specific causes of action fail to state a claim as a matter of law [Docket No. 23].

### III.   JURISDICTION

The Court exercises original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Plaintiff alleges causes of action arising under the laws of the United States.

### IV.   LEGAL STANDARD

When considering a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir.

2005). It is well-settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted) (first citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957); then citing *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994); and then citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

> To determine the sufficiency of a complaint, a court must take three steps. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (alterations in original) (citations omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 675, 679 (2009)). A court may "generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *Twombly*, 550 U.S. at 563 n.8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *see also Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("*Iqbal* . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before *Twombly*."). "A motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on its face.'" *Malleus*, 641 F.3d at 563 (quoting *Twombly*, 550 U.S. at 570). Further, may prevail on the statute of limitations at the motion to dismiss stage 'if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Demetro v. Police Dep't, City of Cherry Hill, N.J.,* 2011 WL 5873063, at *7 (D.N.J. Nov. 22, 2011) (quoting *Robinson v. Johnson,* 313 F.3d 128, 135 (3d Cir.2002)).

## V.   ANALYSIS

Plaintiffs assert various claims against Defendants based on the parties' long history. First, Plaintiffs argue that Defendants denied them equal protection under the law by unfairly enforcing the Township Code against Plaintiffs and interfering with their use of the Farm. [Compl. ¶¶ 326, 351–352, 372–377.] Second, Plaintiffs contend that Defendants violated their right to procedural and substantive due process because Defendants revoked and denied Plaintiffs' land use permits, insisted

on compliance with nonexistent Township Codes, and raided Plaintiffs' property. [*Id.* ¶¶ 357–358, 362–363, 383–393.] Finally, Plaintiffs argue Defendants violated the New Jersey Racketeering Influenced and Corrupt Organization Act ("NJ RICO") because Defendants acted in concert to intimidate Plaintiffs and obstruct their property rights in order to benefit the Fire Marshal and his family. [*See Id.* ¶¶ 396–398, 402–404,  409, 411, 428–429.]

Defendants argue that most of Plaintiffs' allegations are barred by the applicable statute of limitations because the conduct alleged by Defendants consisted of discrete acts that put Plaintiffs on notice of their claims. [Monroe Br. at 16–17, 22–23; Ind. Motion at 8.] Second, Defendants contend Plaintiffs cannot maintain any equal protection claims because the Complaint fails to allege that "the [D]efendants treated [P]laintiffs differently from another similarly situated individual . . . based upon any unjustifiable standard." [Monroe Br. at 1–2; Ind. Motion at 13–14.] Third, Defendants contend that Plaintiffs' substantive due process claims should be dismissed because "[a]t most, the facts allege disagreements over enforcement of municipal ordinances," which does not shock the conscience. [Monroe Br. at 30.] Fourth, Defendants argue that Plaintiffs' procedural due process claims fail because the Complaint does not allege "that the Township had no, or inadequate, procedures in place to address [the] issues or that [P]laintiffs were denied access to these procedures." [*Id.* at 33.] Finally, Defendants dispute Plaintiffs' NJ RICO claim, arguing that the facts alleged by Plaintiffs "fail to constitute a 'pattern of

17

racketeering', or even a single RICO predicate offense." [Monroe Opp'n at 15; Ind. Motion at 10.]

A.    **Most of Plaintiffs' Allegations Are Time-Barred**

First, the Court considers the applicable statute of limitations for Plaintiffs' claims. Title 42, U.S. Code, Section 1983 provides the federal cause of action, however, state law "determines when the claim accrues." *Dique v. New Jersey State Police*, 603 F.3d 181, 185 (3d Cir. 2010). This is because Section 1983 claims are characterized as personal injury claims, and thus, adopt the applicable state statute of limitations for such claims. *Id.* Therefore, in New Jersey, Section 1983 claims are subject to the two-year statute of limitations for personal injury claims under N.J.S.A. 2A:14-2. *Id.* (holding the statute of limitations for section 1983 claims in New Jersey is two years in accordance with New Jersey personal injury law); *Williams v. Borough of Highland Park*, 707 F. App'x 72, 75 (3d Cir. 2017). Claims brought under the NJCRA are also subject to a two-year statute of limitations. N.J. Stat. Ann. § 2A:14-2. Further, the parties do not dispute that two-years is the applicable statute of limitations for such claims. [Monroe Opp'n at 5–6; Monroe Br. at 16; Ind. Br. at 8.]

A Section 1983 claim accrues, "and the statute of limitations begins to run, 'when the plaintiff knew or should have known of the injury upon which its action is based.'" *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) (quoting *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir.1998)). The *Kach* Court explained the justification for this rule:

18

> [t]he cause of action accrues even though the full extent of the injury is
> not then known or predictable. Were it otherwise, the statute would
> begin to run only after a plaintiff became satisfied that he had been
> harmed enough, placing the supposed statute of repose in the sole hands
> of the party seeking relief.

*Id.* at 634–635 (quoting *Wallace v. Kato*, 549 U.S. 384, 391, 127 S. Ct. 1091, 1097, 166

L. Ed. 2d 973 (2007)). Here, the Complaint filed first-in-time by Plaintiffs was that in

this federal court action on July 1, 2022. [Docket No. 1.] Thus, any claims arising

under Section 1983 or the NJCRA that Plaintiffs knew, or should have known, of

prior to July 1, 2020, are time-barred.

Defendants correctly point out that "virtually all the defendants' alleged acts

upon which Plaintiffs base their constitutional claims" occurred before the statute of

limitations period. [Monroe Br. at 16–17.] More specifically, Defendants assert that

each of the alleged acts committed before the statute ran were discrete and actionable

at the time they occurred, and that Plaintiffs knew, or at least should have known, of

their alleged injuries when they occurred. [Monroe Reply 3–4.] Plaintiffs do not

dispute the fact that many of their allegations fall outside the statute of limitations

period, but nonetheless, argue that such conduct is actionable as part of a continuing

practice of unlawful acts by Defendants and since "the last act evidencing the

practice falls within the limitations period." [Monroe Opp'n at 8 (quoting *Cibula v.

Fox*, 570 F. App'x 129, 135 (3d Cir. 2014)).]

Plaintiffs cite *Bennett v. Susquehanna Cty. Children and Youth Servs.*, 592 Fed.

App'x 81, 85 (3d Cir. 2014) as support for their argument that the continuing

violations doctrine may apply in the context of a Section 1983 claim. In *Bennett*, the

Third Circuit expressly acknowledged that the limitations exceptions under the doctrine "is most often applied in employment discrimination cases," and depends on two factors:  "(1) whether the violations were related in subject matter, and (2) whether the acts were recurring." *Id.* at 84 (quoting *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir.2001)). The Third Circuit found that a mother who had lost custody of her children could not maintain a time-barred claim of duress against caseworkers who had removed the children. The claim was based on only four occasions where the mother was told her children could be taken away from her while reviewing and signing child safety plans. Although these acts all related to the same subject matter regarding custody of her children, the court found that "the frequency of the defendants' alleged coercion does not rise to the level required by the continuing violations doctrine." *Id.* at 85.

After all, "the proper focus is upon the time of the *discriminatory* acts, not upon the time at which the *consequences* of the acts became most painful." *Williams*, 707 F. App'x at 76 (citations and quotation marks omitted). In *Williams*, the plaintiffs received notices in 2012 that they were not in compliance with a sidewalk maintenance ordinance and were subsequently issued summonses in 2014 and 2015 for noncompliance. *Id*. at 73–74. The Third Circuit rejected the plaintiffs' argument that the summonses should be considered separate events that reset the limitations period because there is a distinction between "continual unlawful acts" and "continual ill effects from an original violation." *Id.* at 76 (quoting *Cowell v. Palmer Twp.*, 263 F.3d 286, 293 (3d Cir. 2001)). *Williams* held that the plaintiffs "were aware

20

of the consequences of the ordinance as applied to them when they received the 2012 notices," and therefore, should have "brought their § 1983 claims within the applicable limitations period instead of waiting until after they experienced additional consequences…." *Id.*

Like in *Williams*, here, the Court finds that the alleged unlawful acts by Defendants were discrete acts that put Plaintiffs on notice of their alleged injuries at the time they occurred. The Court also finds that Plaintiffs were not prevented from asserting their claims "as a result of extraordinary circumstances that would warrant equitable tolling." *Bennett*, 592 F. App'x at 84. The allegations set forth in the Consolidated Complaint clearly establish that the alleged unlawful acts by Defendants were recurring, which satisfies the second prong of the continuing violations doctrine. However, the Court finds that Plaintiffs have failed to plead the first prong for the continuing doctrine to apply, namely, that the alleged unlawful acts relate to the same subject matter. *Bennett*, 592 Fed. App'x at 84. Indeed, the Consolidated Complaint makes clear that Defendants' acts pertain to a multitude of different subject matter regarding Plaintiffs' and Plaintiffs' neighbors' land use, including construction of the safety berm, having and housing livestock, tree removal, fencing construction and painting, flooding and pond creation, a raid of Plaintiffs' property, light poles, and the neighbors' permits and land use, among others.

In any event, the Court finds that based on the pleadings, it is incontrovertible that Plaintiffs had actual knowledge of their alleged injuries before the expiration of

the limitations period. Indeed, Paragraph 9 of the Consolidated Complaint admits as much:

> Beginning in June 2018, [Plaintiffs] noticed a negative change in the way [they were] being treated by Township officials in dealings with the Township when conducting official business for permits, licenses and other Township approvals for the use and development of the property.

[Compl. ¶ 9.] The Court finds that the various compliance notices and permit denial Plaintiffs received, as well as the raid by the Defendants on Plaintiffs' land, were discrete events that put Plaintiffs on notice of their purported injuries. Accordingly, for purposes of Plaintiffs' claims arising under Section 1983 and the NJCRA, the Court finds that allegations occurring prior to July 1, 2020, are time-barred.[7]

### B. Plaintiffs' Timely-Asserted Allegations and Various Theories of Liability under Section 1983 and the NJCRA

Plaintiffs' remaining allegations timely-asserted for purposes of their claims arising under Section 1983 and the NJCRA concern the following events: Ms. Park's letter in July 2020 that the location of Plaintiffs' chicken coop violated the Township code, Ms. Park's letter in August 2020 that withdrew some violations but insisted on a fence violation (followed by reinstatement of the withdrawn violations), denial of Mr. Valentine's farm accessory structures permit accompanied with a

---

[7] Plaintiffs also assert violations of 42 U.S.C. § 1988 in conjunction with their section 1983 claims. [Compl. ¶¶ 355, 359, 363.] The Court agrees with Defendants that, to the extent that the Section 1983 claims are not timely, such claims are also not properly before the Court under Section 1988. [Monroe Motion 17, n.3 (citing *Fox v. Vice*, 563 U.S. 826, 832–833 (2011) (Section 1988 provides for the award of reasonable attorney's fees to the prevailing party in a Section 1983 case).]

citation regarding construction of a feed shed structure, the Fire Marshal chasing another individual onto Plaintiffs driveway resulting in a violent altercation in March 2021, the volunteer fireman who confessed to issuing citations to Mr. Valentine's girlfriend to get a paid position (which the Fire Marshal did not correct), reporting his neighbor storing hundreds of damaged vehicles that were potentially polluting in September 2021 (reported to Ms. Park but never looked into), and the plumbing code violations issued by Defendant D'Amico (which allegedly had nothing to do with plumbing and were issued six hours after reporting the neighbor's vehicles). [Compl. ¶¶ 119, 122–124, 128–139, 140–152.] Next, the Court considers whether the Consolidated Complaint states a plausible claim for relief under the various theories of liability and causes of action asserted by Plaintiffs.

### 1. Equal Protection under Section 1983 (Counts I and III) and the New Jersey Civil Rights Act (Count V)

"Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002); 42 U.S.C. § 1983. Similarly, the NJCRA creates a private cause of action under state law for "the deprivation of any substantive due process of equal protections rights, privileges or immunities" secured by federal or state law. N.J. Stat. Ann. § 10:6-2(a).

"The Equal Protection Clause of the Fourteenth Amendment, § 1, commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 2331, 120 L. Ed. 2d 1

(1992); U.S. Const. amend. XIV. The Equal Protection Clause "does not forbid classifications . . . [i]t simply keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike." *Id.* (quoting *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)). Plaintiffs' selective enforcement claim requires them to show "(1) that [they were] treated differently from other similarly situated [entities], and (2) that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, ... or to prevent the exercise of a fundamental right." *PG Pub. Co. v. Aichele*, 705 F.3d 91, 115 (3d Cir. 2013) (citations and quotations omitted).

Plaintiffs assert selective enforcement violations under Section 1983 and the NJCRA, arguing "(1) that the [D]efendants used their powers to punish and harass [P]laintiffs at the direction of politically connected individuals; and (2) that the [D]efendants used selective enforcement to damage the Plaintiffs." [Ind. Opp'n at 8; Monroe Opp'n at 10.] Plaintiffs, citing *Simmermon v. Gabbianelli*, 932 F. Supp. 2d 626, 633 (D.N.J. 2013), also argue that the issue of "whether an individual is similarly situated for Equal Protection claims is a question of fact for a jury to determine." [Ind. Opp'n at 8.] However, the Court finds that Plaintiffs reliance on *Simmermon* is misplaced. There, the District Court explained that the plaintiffs' selective enforcement claim survived summary judgment only if "a reasonable jury could conclude that they were treated differently from other similarly situated individuals and that a reasonable jury could conclude that this selective treatment was based on an arbitrary factor or intended to prevent the exercise of a fundamental

24

right." *Simmermon*, 932 F. Supp. 2d at 632. Here, Plaintiffs must first plead the requisite elements of their claims before then showing that a reasonable jury could find in their favor based on the evidence of record.

Conversely, Defendants assert two main arguments:  first, that the Consolidated Complaint does not identify any alleged instances of disparate treatment which occurred after July 1, 2020; second, that Plaintiffs have not alleged any facts from which it can be inferred that Plaintiffs' neighbors are alike in all relevant aspects. [Ind. Motion 8, 14; Monroe Br. at 25–26.] The Court does not agree with Defendants' first argument and finds that, read in context, the allegations concerning the unwarranted plumbing code violations is an example of disparate treatment timely asserted by Plaintiffs.

The Court finds convincing Defendants' arguments that Plaintiffs have failed to plead that their neighbors are "alike in all relevant aspects," and that the Plaintiffs have not even identified "a single specified Code violation or enforcement action which was applied unevenly to plaintiffs' [Farm] as compared to the Neighbors' property." [Monroe Br. at 26–27.] "An essential element of a claim of selective treatment under the Equal Protection Clause is that the comparable parties were 'similarly situated.'" *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (citing *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)). Indeed, Plaintiffs have not pled that their property is similar to their neighbors in terms of land use. For example, if the neighbors are not farmers, then they likely would have no need for a livestock permit like Plaintiffs. And if they do not shoot firearms, they would

have no interactions with Township officials about the potential need for a safety berm.

After careful review of the timely allegations set forth in Consolidated Complaint, the Court finds that Plaintiff fail to specify any particular provision of the Township code that was enforced against them relative to a similarly situated neighbor in land use terms. Ms. Park's letters regarding violations for Plaintiffs' chicken coop, fence, and feed shed structure concern only Plaintiffs' land. The same is true regarding the Fire Marshal's alleged altercation with another individual on the Farm and the plumbing code violations issued by Defendant D'Amico. Plaintiffs' remaining allegation that they reported a neighbor for storing hazardous vehicles not investigated by Defendants (while Plaintiffs' various violations were promptly looked into) is a closer call. The U.S. Supreme Court found allegations that a municipal requirement for a plaintiff to construct a 33-foot easement while requiring only a 15-foot easement of similarly situated property owners as "irrational and wholly arbitrary" were "sufficient to state a claim for relief under tradition equal protection analysis." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000). Plaintiffs' inference that he was retaliated against with nonexistent plumbing code violations for reporting a neighbor's violation of a different provision of the Township code regulating hazardous materials still does not make out a plausible claim of selective enforcement because there are no allegations in the Consolidated Complaint that the neighbors were similarly situated under the code in the first instance. Accordingly,

the Court finds that the Consolidated Complaint fails to state a plausible selective
enforcement claim.

       **2.**      **Substantive Due Process under Section 1983 (Counts II and IV)
and the New Jersey Civil Rights Act (Count VI)**

The Monroe Defendants argue that Plaintiffs' substantive due process claims
must be dismissed because the timely-asserted allegations in the Consolidated
Complaint do not rise to the heightened "shocks the conscience" standard required
of such claims. [Monroe Br. at 28–30.] The NJCRA was modelled after section 1983,
and thus New Jersey state courts apply the same "shocks the conscience" standard to
substantive due process claims arising from land use decisions. *Rezem Fam. Assocs.,
LP v. Borough of Millstone*, 423 N.J. Super. 103, 115, 30 A.3d 1061, 1067 (App. Div.
2011) (citations omitted).

The Monroe Defendants primarily rely upon *United Artists Theatre Cir., Inc. v.
Twp. of Warrington, PA*, 316 F.3d 392, 394 (3d Cir. 2003), where in adopting the
standard, the Third Circuit explained that "[a]pplication of the 'shocks the
conscience' standard in this context also prevents us from being cast in the role of a
'zoning board of appeals.'" *United Artists Theatre Cir., Inc. v. Twp. of Warrington, PA*,
316 F.3d 392, 402 (3d Cir. 2003). The Circuit acknowledged that its ruling brought it
into line with the Eighth Circuit's decision in *Chesterfield Dev. Corp. v. City of
Chesterfield*, finding allegations that a city arbitrarily applied a zoning ordinance
insufficient to state a substantive due process claim and noting in dicta that even a
"bad-faith violation of state law remains only a violation of state law." *Id.* (quoting

963 F.2d 1102, 1105 (8th Cir. 1992)). In *Cnty. Concrete Corp. v. Town of Roxbury*, the Third Circuit clarified that *United Artists* "did not apply the 'shocks the conscience' standard to *legislative* action; rather, we clearly held in *United Artists* that "*executive action* violates substantive due process only when it shocks the conscience." 442 F.3d 159, 169 (3d Cir. 2006) (citing *United Artists*, 316 F.3d at 399–400 (emphasis in original).

Here, the Court finds that Plaintiffs' challenges regarding how Defendants enforced the Township code against them relative to their neighbors concerns non-legislative action. Like in *Chesterfield Dev.*, the Court finds that the Consolidated Complaint does not contain any timely allegations that Defendants engaged in the kind of "truly irrational governmental actions" that shocks the conscience and gives rise to a non-legislative substantive due process claim under federal or state law. 963 F.2d at 1104. Instead, the relevant, timely allegations in the Consolidated Complaint concern the legitimacy of the plumbing code violations and other specific violations cited in Ms. Park's letters under the Township code. Such allegations seem "better addressed to state courts and administrative bodies. Otherwise, every violation of state law could be turned into a federal constitutional tort." *Id.* Accordingly, the Court finds that Plaintiffs fail to state a plausible claim for violations of substantive due process.

### 3.    Procedural Due Process under Section 1983 (Count IV)

"In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those

processes are unavailable or patently inadequate." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." *Id.* (quoting *Dusanek v. Hannon,* 677 F.2d 538, 543 (7th Cir.1982) (citations omitted). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Id.* (citing *McDaniels v. Flick,* 59 F.3d 446, 460 (3d Cir.1995) (citations omitted). The Court finds that there are no timely-asserted allegations in the Consolidated Complaint that Defendants had no, or inadequate, procedures in place, or that Plaintiff was denied access to any of the Township's specific zoning procedures. Accordingly, the Consolidated Complaint states no plausible violation of Plaintiffs' procedural due process.

## C.    NJ RICO (Count VII)

In New Jersey, RICO claims are subject to a four-year statute of limitations. *See Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d Cir. 2006). Thus, Plaintiffs allegations as stated in the Consolidated Complaint are timely for purposes of this remaining claim. To state a claim under N.J.S.A. 2C:41-2(c), a plaintiff must plead:

> (1) The existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that the defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity.

*State v. Ball*, 141 N.J. 142, 661 A.2d 251 (1995). NJ RICO defines "racketeering activity" more expansively than the federal RICO statute and includes a list of crimes

constituting "racketeering activities" in addition to any "racketeering activities" set forth in 18 U.S.C. § 1961(1)(A), (B) and (D), such as murder, kidnapping, gambling, extortion, fraud in the offering, sale or purchase of securities, and violation of specific state statutes, among other things. N.J.S.A. § 2C:41-1(a). To establish a "pattern of racketeering" a plaintiff must show that: (1) the defendant committed at least two predicate acts, and (2) "the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." *See Ball*, 141 N.J. at 163–164, 167–169, 661 A. 2d 251 at 261–262, 264–265.

Plaintiffs generally allege that Defendants denied them permits they otherwise qualified for, issued unwarranted citations, and imposed nonexistent requirements. However, it appears that Plaintiffs RICO claim is severely lacking in terms of what prohibited "racketeering activity" was committed by any named Defendant, when the alleged RICO conspiracy occurred, its scope, who participated in it, and to what extent. Defendant Mayor DiLucia also makes a compelling argument that Plaintiffs identify no instance of his personal involvement. [Monroe Br. at 38.]

In any event, the Court declines to exercise supplemental jurisdiction over Plaintiffs' NJ RICO claim. Having found that Plaintiffs' Consolidated Complaint fails to state a plausible federal claim upon which relief may be granted, the Court find that there are no circumstances warranting jurisdiction over Plaintiffs' remaining state law claim at this early stage of the litigation. *See Bright v. Westmoreland Cnty.*,

30

443 F.3d 276, 286 (3d Cir. 2006). Still, it appears that Plaintiffs' vague allegations of "fraudulent" permit denials, citations, and personal animus fail to state a claim of "racketeering activity" by Defendants prohibited under NJ RICO. NJ RICO prohibits certain frauds, including mail and wire fraud, but the Consolidated Complaint fails to plead, with specificity, any such prohibited frauds or other conduct by Defendants that violated a particular subsection of prohibited "racketeering activity" under the statute.

Further, the Court notes that in federal RICO cases the Court typically requires a RICO Case Order, pursuant to Local Rule of Civil Procedure 16.1 and this Court's Individual Rules and Procedures. Such RICO Order calls for detailed factual allegations by a plaintiff asserting such claim and is appended to the Local Rules as Appendix O, which is based upon the "reasonable inquiry" requirement under Fed. R. Civ. P. 11 that counsel conduct into the law and facts before signing pleadings. Here, no such RICO Order was required since Plaintiffs' claims arise under New Jersey law, but the Court still has concerns regarding Rule 11's "reasonable inquiry" requirements in light of the causes of action asserted in Plaintiffs' Consolidated Complaint.

The Court is also mindful of Plaintiffs' representation that their disputes with Defendants "have continued into the present" and that they intend to seek leave to further amend their pleadings "to include actions arising by defendants since the filing of the last amended complaint." [Monroe Opp'n at 8.] However, pursuant to Local Rule of Civil Procedure 15.1, Plaintiffs may only further amend their pleading

by filing a motion that complies with the requirements of the Rule. To date, Plaintiffs have filed no such motion.

## VI.   CONCLUSION

For the reasons set forth herein, the Court will **GRANT** Defendants' Motions. Plaintiffs' federal claims (Counts I-VI) shall be **DISMISSED WITHOUT PREJUDICE**. An accompanying Order shall issue separately on today's date.


**August 31, 2023**                    **s/Renée Marie Bumb**
Date                                        Renée Marie Bumb
                                            Chief United States District Judge